IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

| | | |
|---|---|---|
| WASEEM DAKER, | * | Case No. |
| | * | 6:14-CV-00047 |
| Plaintiff | * | |
| | * | |
| v. | * | |
| | * | |
| PATRICK H. HEAD, et al, | * | |
| | * | |
| Defendants | * | |

## DECLARATION OF WASEEM DAKER AND PROFFER ON UNAVAILABILITY OF ADMINISTRATIVE REMEDIES

COMES NOW WASEEM DAKER, and, pursuant to 28 USC § 1746, declares under penalty of perjury that the above and foregoing are true and correct to the best of my knowledge.

1. I am Waseem Daker. I am *sui juris* and competent to testify in this matter.

2. I have personal knowledge of, and am personally familiar with, the facts set forth in this Declaration.

3. I give this Declaration as evidence in support of Plaintiff's Motion to Not Stay Discovery pending disposition of Defendants' Motion to Dismiss, as a proffer of what I expect the evidence will show if I am allowed to seek discovery on the issues of exhaustion and unavailability of administrative remedies in the Georgia Department of Corrections ("GDC").

4. I have been incarcerated in the custody of the Georgia Department of Corrections ("GDC") from October 3, 2012, to date.

5. From October 3, 2012, until April 7, 2014, I was incarcerated in GDC custody at Georgia Diagnostic & Classification Prison ("GDCP") Special Management Unit ("SMU"), in Jackson, Butts County, Georgia.

6. From April 7, 2014, to April 19, 2018, I was incarcerated in GDC custody at Georgia State Prison ("GSP"), in Reidsville, Tattnall County, Georgia.

7. From April 19, 2018, to December 26, 2018, I was incarcerated in GDC custody at Macon State Prison ("MSP"), in Oglethorpe, Macon County, Georgia.

8. From December 26, 2018, to date, I have been incarcerated in GDC custody at Valdosta State Prison ("VSP"), in Valdosta, Lowndes County, Georgia.

## I. GDC Grievance Procedure

47. In <u>Ross v. Blake</u>, 578 US ___, 136 SC 1850, 195 LE2d 117 (2016), the Supreme Court held that "An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." 578 US at ___, 136 SC at 1858. "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" 578 US at ___, 136 SC at 1859. The Court held, "Building on our own and lower courts' decisions, we note as relevant here three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." <u>Id</u>. "First,… an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." <u>Id</u>. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." <u>Id</u>. "And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." 578 US at ___, 136 SC at 1860. From personal experience, I can testify that all three(3) <u>Ross</u> situations exist in the Georgia Department of Corrections ("GDC").

**A. The GDC Grievance Procedure is not an available administrative remedy because it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates.**

48. Although the GDC has a Grievance Procedure, as set forth in GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure,"[1] that procedure is a sham: "it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates."

**1. Grievance officials do not investigate or preserve any evidence that will support the prisoner's grievance.**

49. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.C.1.f provides:

> Processing:
> i. The Grievance Coordinator shall appoint an appropriate staff member to thoroughly investigate the Offender's complaint. *The investigation may include interviewing the Offender, interviewing witnesses, taking statements, and obtaining documents.*
> (Emphasis supplied.)

50. Despite this provision of SOP, grievance officials do not interview the prisoner who filed the grievance, interview other prisoners who were witnesses, or obtain or preserve documents that support the grievance.

51. Grievance officials never interview or speak with the prisoner to try to investigate, clarify, accurately understand, or resolve the grievance.

52. I have never had any grievance official interview me regarding a grievance, ask me for further information, ask me for clarification, or try to resolve the grievance.

53. When I have listed other prisoners as witnesses, no grievance official has ever interviewed any of my witnesses in response to any of my grievances.

---

[1] https://www.powerdms.com/public/GADOC/documents/105711

54. When I have requested that dormitory surveillance videos be reviewed or preserved, or when such videos are available, no grievance official has ever reviewed or preserved any videos in response to any of my grievances.

55. Of all my grievances and appeals, the only time any grievance investigator ever came to speak with me regarding a grievance was once in August 2016 when GDC Investigator Jaime Villegas came to speak with me to try to *coerce me into dropping* a grievance.

### 2. Grievance officials only investigate or preserve any evidence that will supports denying the prisoner's grievance.

56. The only "investigation" in response to a grievance consists of simply asking a staff member for a witness statement that either denies or justifies the matter grieved, and then preparing a grievance response that parrots whatever the staff member's witness statement.

57. No attempt is made to actually investigate either the veracity of the grievance or of the staff member's witness statement.

58. When other prisoners are listed as witnesses in a grievance, grievance officials do not interview prisoner witnesses.

59. When dormitory surveillance videos are available that regarding a matter that has been grieved, grievance officials make no attempt to review or preserve those dormitory surveillance videos.

### 3. Grievance officials only rubberstamp-reject or rubberstamp-deny grievances.

60. I have personally filed well more than 120 grievances, and I have never received any relief in response to any of them.

61. Almost all my grievances were rubberstamp-rejected or rubberstamp-denied.

62. A typical Grievance Response is simply a form-letter-type denial with blanks to fill

in.

63. A typical GSP Grievance Response is simply a form-letter-type denial with blanks to

fill in as follows:

> According to [fill in the name of the staff member who was asked
> to write a witness statement], [repeat whatever the staff member's
> witness statement said]. Therefore, this grievance is denied.

64. A typical VSP Grievance Response is simply a form-letter-type denial with blanks to

fill in as follows:

> In reference to grievance #[fill in grievance number], you allege
> that [fill in prisoner's complaint]. Per [fill in the name of the staff
> member who was asked to write a witness statement], [repeat
> whatever the staff member's witness statement said]. Therefore,
> your grievance is denied.

65. A typical GDC Central Office Grievance Appeal Response is simply a form-letter-

type denial with blanks to fill in as follows:

> A member of my staff has reviewed your grievance. You allege
> that [fill in prisoner's complaint]. This review revealed that
> [fill in the name of the staff member who was asked to write a
> witness statement], [repeat whatever the staff member's witness
> statement said]. There is insufficient evidence to substantiate your
> allegations. Based on this information, this grievance is denied.

66. An example of GDC rubberstamp-denying grievances can be seen by two(2)

grievances filed by two(2) prisoners on the same issue with conflicting denials.

A. In 2015, prisoner Walker Bazemore filed a grievance on the fact that lockdown

prisoners at GSP are denied showers if their cell is "not inspection ready," an established

practice at GSP. However, the official who wrote a witness on the grievance denied that

any such practice existed at GSP. On that basis, Bazemore's grievance was denied.

B. On the other hand, Christopher Phillips also filed a grievance on this same issue. However, the official who wrote a witness on the grievance admitted denying Phillips a shower, but justified it on the basis that he was "not inspection ready." On that basis, Phillips's grievance was also denied, albeit for reasons which directly contradict and disprove the denial of Bazemore's grievance.

67. So long as any official writing any witness statement in response to a grievance either denies the matter or justifies it, grievance officials will deny the rubberstamp-deny grievance based on the witness statement, without attempting to ascertain the veracity of the staff member's witness statement.

68. A grievance is seldom ever granted, typically only when the staff member involved was inexperienced or foolish enough to write a statement that admitted wrongdoing and failed to justify it.

69. This has rendered the GDC Grievance Procedure "a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." <u>Ross</u>, 578 US ___. GDC officials responding to a grievance know that they need only write a witness statement that denies that alleged wrongdoing or that admits it but justifies it, with the result that grievance officials will deny the grievance parroting their witness statement as fact, even when it is not— and it almost always is not factually true.

70. On a rare handful of grievances, the grievances responses stated that they were "partially granted." However, even on those occasions, I still never received any relief.

**4. GDC officials do not investigate uses of force in response to grievances.**

71. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," §§ IV.C.1.g.ii. provides:

> Accepted Grievances: If a grievance alleges Physical Force and is
> deemed to be Non-Compliance and is accepted, the facility shall
> forward a copy of the grievance packet containing all relevant
> information to the Criminal Investigation Division by Region for
> review and any action deemed appropriate.

72. I have filed multiple grievances pertaining to unnecessary or excessive uses of force
that were administratively closed as grievances and forwarded to Internal Investigations Unit
("IIU"), including but not limited to: #143638 at GDCP, #231559, #231560, #232953, and
#263868 at GSP; #268451 at MSP; and #296524 at VSP. No person from IIU has ever
interviewed me or spoken with me regarding any grievance regarding any use of force at all, nor
have I ever received any response at all regarding any of these use-of-force grievances.

**B. The GDC Grievance Procedure is not an available administrative remedy
because it so opaque that it becomes, practically speaking, incapable of use, because no
ordinary prisoner can discern or navigate it.**

73. In Woodford v. Ngo, 548 US 81, 102-03, 126 SC 2378, 165 LE2d 368 (2006), the
Court noted that "we have no occasion here to decide how such situations might be addressed" in
situations where "prisons might create procedural requirements for the purpose of tripping up all
but the most skillful prisoners." The GDC Grievance Procedure here is designed to, and does,
"create procedural requirements for the purpose of tripping up all but the most skillful
prisoners," so as to trigger procedural defaults that result in dismissals of prisoners' Complaints
against GDC and its employees. This is done through several ways:

**1. The GDC Grievance Procedure imposes a strict ten(10)-day deadline that
is never waived, even when good cause is shown.**

74. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.C.1.b
provides that "The complaint… must be submitted no later than ten (10) Calendar Days from the
date the Offender knew, or should have known, of the facts giving rise to the grievance.
Grievances filed later than ten (10) days may only be considered upon Good Cause."

75. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.C.1.e.ii provides that "The Warden/Superintendent or designee should reject the grievance, via the JPay System or on paper if it:... 2) Is not filed timely; however, the Grievance Coordinator may waive the time limit for Good Cause[.]"

76. These provisions do not define "good cause," leaving the grievance coordinator unlimited discretion to reject any grievance as untimely whenever is filed after ten(10) days.

77. Despite these provisions, grievance coordinators never waive the ten (10)-day deadline, even when "good cause" is shown, but will still rubberstamp-reject the grievance as "out-of-time."

78. I have on many occasions filed a grievance out-of-time because I could not even get a grievance form before the ten(10)-day deadline had expired, but they were still rubberstamp-rejected as out-of-time.

79. I have on many occasions filed a grievance out-of-time because I could not see a counselor to whom to submit the grievance form before the ten(10)-day deadline had expired, but they were still rubberstamp-rejected as out-of-time.

80. I have on some occasions filed a grievance out-of-time because I had surgery on my hand and could not write any grievances before the ten(10)-day deadline had expired, but they were still rubberstamp-rejected as out-of-time.

81. The effect of the above is that GDC has effectively superseded the two (2)-year statute of limitations of OCGA § 9-3-33 with the ten(10)-day deadline of GDC SOP 227.02 (IIB05-0001).

**2. The GDC Grievance Procedure limits a prisoner to only two(2) active grievances.**

82. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.B.4 provides:

An Offender is limited to two (2) Active Grievances:

a. Active Grievances with Offender Access to the Kiosk/Tablet:

i. If an Offender's new grievance would exceed the two (2) Active Grievances limit, the Grievance Coordinator will advise the Offender, via a JPay System message, that he may voluntarily drop one (1) of the two (2) Active Grievances.

ii. The Offender must return a message, via the Kiosk/Tablet, to the Grievance Coordinator, within five (5) days, stating that he or she wishes to drop one of the active grievances and provide the Reference Number of the grievance.

iii. *If the Offender fails to respond via the Kiosk/Tablet, to the Grievance Coordinator, within five (5) Calendar Days, then the third (3rd) grievance will be closed.*

iv. If the Offender responds after five (5) Calendar Days, it may be accepted with Good Cause.

b. Active Grievances without Offender access to the Kiosk/Tablet: Attachment 10, must be used, by staff and the Offender, if the Kiosk/Tablet is not used to process the grievance.

i. If an Offender's new grievance exceeds the two (2) Active Grievances limit, the Grievance Coordinator will advise the Offender, utilizing Attachment 10, Active Grievances Process Form, that he may voluntarily drop one of the (1) of the two (2) Active Grievance. The Grievance Coordinator will enter the grievance in the JPay System and note that Attachment 10, Active Grievances Process Form was forwarded to the Offender.

ii. The Offender must return Attachment 10, Active Grievances Process Form and the new grievance to his Counselor within five (5) Calendar Days of receipt of Attachment 10, to drop one (1) of the two (2) Active Grievances. The Counselor will then forward Attachment 10, Active Grievances Process Form and the new grievance back to the Grievance Coordinator. The Grievance Coordinator will enter this information in the JPay system and drop the appropriate grievance.

iii. *If the Offender fails to return Attachment 10, Active Grievances Process Form, to the Grievance*

9

*Coordinator, within five (5) Calendar Days, then the third (3rd) grievance will be closed.*
iv. If the Offender returned Attachment 10, Active Grievances Process Form after five (5) Calendar Days, it may be accepted with Good Cause.
c. *The Department will not further review a dropped grievance and the Offender's ability to file a grievance or otherwise seek administrative review for the subject matter of a dropped grievance will be forfeited.*
(Emphasis supplied.)

83. Once a prisoner files two (2) grievances, he is effectively denied the grievance procedure for the next 40-50 days. Thus, if he has any more than two (2) issues to grieve in any 50-day period, he is forced to sacrifice grieving some issues in order to grieve others. If he has two (2) grievances pending, and a third issue arises, he is unable to grieve the third issue. This leads to one of three scenarios, all of which lead to an unconstitutional result. First, he can file a third grievance while the first two (2) are pending, in which case the third grievance is rejected as over-the-limit. Second, he can wait until 40-50 days until one of the first two (2) grievances is answered to file a third grievance, in which case the third grievance is rejected as untimely past the ten (10)-day time limit. Third, he can drop one of the first two (2) grievances to allow the third to proceed, but this requires that he sacrifice one of the first two issues. Each of these three scenarios requires a prisoner to sacrifice the right to petition for redress of grievances as to one issue in order to assert the right as to another.[2]

---

[2] In Simmons v. U.S., 390 US 377, 88 SC 967, 976, 19 LE2d 1247 (1967), the petitioner "was obliged either to give up what he believed… to be a valid Fourth Amendment claim, or in legal effect, to waive his Fifth Amendment privilege against self-incrimination." The Court held that such a choice was unconstitutional. "We find it intolerable that one constitutional right should have to be surrendered in order to assert another." In light of Simmons, the federal courts have repeatedly struck down situations where a person was forced to surrender one constitutional right in order to assert another.

In Allen v. City & County of Honolulu, 39 F3d 936, 940 (9th.Cir.1994), the prisoner was given a choice between time in the law library or time for outdoor exercise. The Ninth Circuit held that this was an unconstitutional choice between his First Amendment right of access to the

84. The two grievance limits here forces prisoners to sacrifice exhausting some claims in order to exhaust other claims. Once a prisoner has two (2) grievances pending, the procedure is "unavailable" to grieve any third or subsequent issue. Rhodan v. Schofield, 2001 WL 1810147, *6 (N.D.Ga. June 19, 2007); Daker v. Ferrero, 2004 U.S. Dist. LEXIS 30591, 2004 WL

---

courts and Eighth Amendment right to outdoor exercise: "an inmate cannot be forced to sacrifice one constitutional right solely because another is respected."

In Hebbe v. Pliler, 611 F3d 1202, 1204, *amended*, 627 F3d 338, 343-3444 (9th.Cir.2010), the prison allowed Hebbe "two hours per day, four days per week, during which he could either exercise outdoors or use the law library. These eight hours per week were Hebbe's only opportunity to do either." Id., 611 F3d at 1204; 627 F3d at 341. The Ninth Circuit held that this stated a constitutional claim. "Forcing a prisoner to choose between using the prison law library and exercising outdoors is impermissible because 'an inmate cannot be forced to sacrifice one constitutionally protected right solely because another is respected.'" Id. 611 F3d at 1207; 627 F3d at 940 (quoting Allen, *supra*).

In Cochrane v. Quattrochi, 949 F2d 11, 14-15 (1st.Cir.1991), prison officials conditioned a prison visitor's right to visitation on her agreeing to be searched. The First Circuit found that "appellant in the instant case was confronted with a similar, and no less "constitutionally intolerable," choice between being denied [her First Amendment right to] prison visitation access indefinitely or waiving her [Fourth Amendment] constitutional right to be free from unreasonable search."

In Gluth v. Kangas, 951 F2d 1504, 1508 (9th.Cir.1991), a prison indigency policy forced a prisoner into a dilemma by allowing a limited allowance that could be used either for "necessary hygiene supplies" [Eighth Amendment] or for "stamps and supplies for legal mail" [First Amendment]. The Ninth Circuit held that this was an unconstitutional "Hobson's Choice": this policy, which according to uncontroverted facts forces inmates to choose between purchasing hygienic supplies and essential legal supplies, is "unacceptable."

In Myers v. Hundley, 101 F3d 542, 544-45 (8th.Cir.1996), the Eighth Circuit struck down a prison indigency policy similar to the one at issue in Gluth.

In Howard v. Walker, 405 F3d 114, 118, 128-131 (2nd.Cir.2005), the trial court established a parameter that if Howard cross-examined a State's expert witness concerning the basis of her opinion, then the State could introduce a hearsay statement on which she based her opinion. The Second Circuit, citing Simmons, held that this "offered Howard a constitutionally impermissible choice" between his Sixth Amendment right to cross-examine the witness and his Sixth Amendment right to exclude an unreliable hearsay statement. Id. at 129.

Also, in Howard, the trial court ruled that if Howard called his own expert to testify, the State could introduce the hearsay statement upon cross-examination. Id., 405 F3d at 119, 131-133. The Court of Appeals found that this also was a constitutionally impermissible choice between the right to call witnesses to present a meaningful defense as secured by both the Sixth Amendment Compulsory Process Clause and the Fourteenth Amendment Due Process Clause and his Sixth Amendment right to exclude hearsay.

5459957, No. 1:03-CV-2526-RWS (N.D. Ga. Nov. 24, 2004) (Doc. 31 therein); Daker v.

Ferrero, 506 F.Supp.2d 1295, 1317 n.12 (N.D.Ga.2007).

>    **3. The GDC Grievance Procedure limits a grievance to space provided on the**
>    **grievance form (about one paragraph) plus one attached page.**

85. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.C.1.a

provides:

>    a. The Offender's complaint and requested relief must be stated
>    legibly and in writing in the space provided using the Kiosk/Tablet
>    or the Grievance Form. Only one (1) additional page may be
>    attached to the paper Grievance Form and the Offender may write
>    on only one (1) side of the page.

86. Although 42 USC "1997e(a) requires, and all that it requires, is that the prisoner

provide during the grievance process all of the information concerning his claims that he has or

reasonably could obtain," Brown v. Sikes, 212 F3d 1205, 1210 (11th.Cir.2000), this provision

limits the prisoner can provide.

87. This provision prevents a prisoner from attaching witness statements from other

prisoners.

88. This provision prevents a prisoner from attaching copies of evidentiary documents.

>    **4. The GDC Grievance Procedure limits a grievance to "one issue" without**
>    **any clear rule as to what constitutes a separate issue.**

89. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.C.1.b

provides that "The complaint must be a single issue/incident[.]" GDC SOP 227.02 (IIB05-0001)

"Statewide Grievance Procedure," § IV.C.1.e.ii provides that "The Warden/Superintendent or

designee should reject the grievance, via the JPay System or on paper if it:... 4) Raises more than

one (1) issue/incident[.]"

90. Many issues/incidents consists of multiple parts or sub-issues: e.g., if a guard beats a prisoner (one part) and denies him medical care afterwards (second part); if a guard beats a prisoner (one part) and a second guard who is present fails to intervene to stop the beating (second part); if a guard sprays a prisoner with a chemical agent (one part) and fails to provide an opportunity for de-contamination afterwards (second part); if a guard shakes down a prisoner's cell in retaliation for a grievance (one part) and destroys, damages, or steals some property during the shakedown (second part).

91. This SOP is unconditionally vague in that it does not define a single "issue/incident." As a result, when an issue/incident that consists of multiple parts or sub-issues—which is not uncommon—grievance officials can and will subdivide the grieved issue into "more than one issue" as a pretext to rubberstamp-reject it. A reasonable interpretation would be to employ a definition similar to the standard for joinder under Fed.R.Civ.P. 20(a)(2)(A), or OCGA § 9-11-20(a), where multiple "issues" are deemed parts of the same issue when they "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences." However, GDC officials do not use reasonable interpretations; they use whatever interpretation facilitates their end goal of rejecting the grievance.

92. If a prisoner's issue/incident consists of multiple parts or sub-issues, then Eleventh Circuit case law requires a prisoner to provide all relevant information in his grievance in order to exhaust administrative remedies as to all of them.[3] On the other hand, GDC Grievance

---

[3] In <u>Logue v. Chatham Cty. Det. Ctr.</u>, 152 FedAppx 781, 783 (11th.Cir.2005), the Eleventh Circuit held that a prisoner who sued alleging violations of rights to equal protection and access to the courts based on jail officials' refusal to copy documents did not exhaust equal protection claim when he filed a grievance about non-compliance with copying policy but did not mention race. In <u>Toenninges v. Georgia Dep't of Corr.</u>, 600 FedAppx 645, 649 (11th.Cir.2015), the Eleventh Circuit upheld dismissal for failure to exhaust because plaintiff's "medical grievance contained issues different from those contained in his deliberate indifference claim" and "the substantive discrepancy between his [medical] grievance and his deliberate

Procedure prevents a prisoner from doing just that. If a prisoner includes too much information, then he risks having his Grievance rejected as "more than one issue/incident." If a prisoner includes too little information, then he risks having his Complaint dismissed as to any facts not included in his grievance. GDC Grievance Procedure makes filing a grievance like traversing a minefield. A prisoner never knows if he steps to the left or right if he will be blown up. Prison officials and their lawyers, with the benefit of hindsight not available to the prisoner at the time he files his Grievance, can always argue that the prisoner "should have done it better," either by arguing that he should have included information that was omitted, or should have excluded information that was mentioned.

93. When a civil complaint improperly mis-joins claims under Fed.R.Civ.P. 21[4] or OCGA § 9-11-21,[5] the complaint is not completely dismissed. Instead, courts often sever unrelated claims or direct the plaintiff to recast the complaint. On the other hand, when a grievance is rejected as containing "more than one issue," it is never promptly returned to the prisoner with a notation as to the deficiency, nor is the prisoner given an opportunity to correct or

---

indifference claim casts doubt on the fact that the prison was on notice of his claims against [defendant]." In Hamze v. Steele, 509 FedAppx 897, ___ (11th.Cir.2013), the Eleventh Circuit affirmed a dismissal for failure to exhaust because "grievance complained only of being `placed with other inmates . . . in violation of [his] protective custody' and did not mention an assault or being incarcerated with a particular inmate." In Wright v. Langford, 562 FedAppx 769, 776 (11th.Cir.2014), the Eleventh Circuit upheld a dismissal because, among other things, plaintiff's grievance did not including information that defendant handcuffed him too tightly or jerked him up on the handcuffs, and prison's grievance process requires inmates to "`fully state the time, date, names of . . . staff and inmates involved, names of witnesses, and a narrative of the incident.'"

[4] Fed.R.Civ.P. 21 provides: "Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party."

[5] OCGA § 9-11-21 provides: "Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

re-file it. Instead, grievance officials will always wait until after the ten(10)-day deadline has expired and then reject the grievance as "more than one issue." If the prisoner then attempts to re-file it, the re-filed grievance will then be rubberstamp-rejected as "out-of-time." An example can be seen below in Grievance #274898, which was rejected as having two issues, more than eight (8) months after I filed the grievance.

94. When a grievance is rejected as containing "more than one issue," the response never states what those multiple issues are nor where one issue ends and another issue begins, nor is there any attempt to let the prisoner know "what he did wrong" or "how he should have done it." An example can be seen below in Grievances #274898 and #280199, where Warden Clinton Perry rejected my grievance because "Grievance contained more than one issue/incident," without providing any other information at all, and in my Grievance Appeal #280199, where William Burse denied appeal, without providing any other information at all,

95. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.C.1.e.iv provides that, when a grievance is rejected, "Wardens/Superintendents must still act on the information contained in a rejected grievance that concerns the health or safety of any person in accordance with good prison management." I have repeatedly filed grievances that concerned my safety or health that were repeatedly rejected, and no "Wardens/Superintendents [has ever] act[ed] on the information contained in [any of my rejected] grievance[s] that concern[ed] [my] health or safety…." An example can be seen below in Grievances #274898 and #280199, which were rejected as having two issues—both of which concerned my safety or health—neither of which were acted upon.

### a. Example #1: Grievance #274898

96. An example of this ludicrousness can be seen in my Grievance #274898. On

September 20, 2018, I filed Grievance #274898, which stated as follows:

> **DATE & DESCRIPTION OF INCIDENT:** USE OF FORCE.
> REFER TO INTERNAL INVESTIGATIONS. On Monday,
> September 17, Between 1445-1515 hours [2:45-3:15pm], Facilities
> Director Robert Toole came to my cell, J-1-208, to see my beard.
> He said I needed to shave, and he told Deputy Warden Eaddie to
> "Make sure he shaves." On Tuesday, September 18, 2018, under
> instructions from Mr. Toole, Warden Clinton Perry and Deputy
> Warden Eaddie sent Unit Manager Kegler and the CERT Team (I
> don't know their names, but it included Sgt. Childs, Ofc. Lockett,
> Ofc. Black, Ofc. Pope, and others), to forcibly shave me against
> my religious beliefs. Without provocation, they pepper-sprayed me
> with MK-9 in my cell, and forcibly shaved me. (Please see
> attached sheet.)
>      I suffered cuts to right wrist, right shin, injury to my left
> shoulder, right shoulder, back, right shoulder blade, bruising on
> both upper arms, cut to left lower arm, left knee, right knee, and
> chemical burning in my face, eyes, throat, chest, head, both wrists,
> arms, genitals, lips, and nipples. They did not de-contaminate my
> cell or bedding, which reaks of MK-9.
>      They also did <u>not</u> sanitize the clippers before shaving me. I
> don't know the name of the inmate barber who shaved me but he
> did not clean the clippers nor does he know how to.
>      **RESOLUTION REQUESTED:** I request that Mr. Toole,
> Mr. Perry, Mr. Eaddie, Mr. Kegler, and all members of the CERT
> Team and other officers be fired. I request that the GDC not
> forcibly shave any prisoners against their will.

97. On October 12, 2018, Warden Clinton Perry rejected my grievance because

"Grievance contained more than one issue/incident," without providing any other information at

all.

98. On October 24, 2018, I received the Grievance Response.

99. On October 31, 2018, I filed an Appeal, stating:

> The Warden's rejection as "Grievance contained more than one
> issue/incident," is false and ridiculous. It contains two parts of one
> incident/issue, not two issues/incidents. Mr. Toole's instructions to
> me shave and to Mr. Eaddie to forcibly shave me on 9/17/18 are
> part of the CERT Team's and U/M Kegler's carrying out that threat

on 9/18/18. They are not separate or unrelated, but two parts of the
same issue/incident.

100. On May 1, 2018, Commissioner's Designee William Burse denied my Appeal

stating:

> A member of my staff has reviewed your grievance. This
> grievance revealed that you failed to follow the proper procedure
> for filing the formal grievance. Policy states that the complaint on
> the grievance form must be a single issue/incident. You have noted
> more than one issue. The issues stated are the use of force incident
> and the inmate barber not sanitizing the clippers before he shaved
> you. This grievance was rejected at the institutional level in
> accordance with policy; therefore, this grievance is denied.

101. On May 21, 2019, I received the Appeal Response.

102. Burse's statement that "The issues stated are the use of force incident and the inmate

barber not sanitizing the clippers before he shaved you," is unreasonable given that they occurred

in the same incident.

### b. Example #2: Grievance #280199

103. Another example of this ludicrousness can be seen in my Grievance #280199. On

December 6, 2018, I filed Grievance #280199, which stated as follows:

> **DATE & DESCRIPTION OF INCIDENT:** I request that
> this grievance e processed as an emergency grievance. I have
> repeatedly requested to speak w/ the psychiatrist Dr. Moyinda. On
> 11/1/18, I wrote to Warden Perry, Deputy Warden McKenzie,
> Chief Counselor Streeter, and Counselor Patterson requesting to
> speak w/ the psychiatrist Dr. Moyinda. On 11/13/18, I again wrote
> to Mr. Perry, Ms. McKenzie, Ms. Streeter, and Mr. Patterson
> requesting to speak w/ Dr. Moyinda. I also turned in medical
> requests to Nurse Gail Spikes to speak w/ Dr. Moyinda. On
> 11/28/18, I had a VSee videoconference w/ Baldwin S.P. Mental
> Health Counselor Mr. Whitfield, who refused to let me speak w/
> Dr. Moyinda. I am being denied psychiatrist.
> **RESOLUTION REQUESTED:** I request requesting to
> speak w/ the psychiatrist, Dr. Moyinda. I request mental health
> counseling.

104. On January 4, 2019, Warden Clinton Perry rejected my grievance because

"Grievance contained more than one issue/incident," without providing any other information at

all.

105. On January 17, 2019, I received the Grievance Response.

106. On February 11, 2019, I filed an Appeal, stating:

> The Warden's response is that the grievance is rejected because
> "Grievance contained more than one issue/incident." This is both
> false and is a lame excuse to rubberstamp-reject the grievance. The
> issue is that I have repeatedly requested to speak w/ the
> psychiatrist, Dr. Moyinda, and I was being denied/ignored. Each of
> my requests is not a separate issue. They are multiple parts of the
> same ongoing issue. GDC SOP's "one-issue" rule is
> unconstitutionally vague and is being used to rubberstamp-reject
> my grievance in bad faith. The grievance should be considered on
> its merits.

107. On October 22, 2019, Commissioner's Designee William Burse denied my Appeal

stating:

> A member of my staff has reviewed your grievance. This
> grievance revealed that you failed to follow the proper procedure
> for filing the formal grievance. Policy states that the complaint on
> the grievance form must be a single issue/incident. You have noted
> more than one issue. This grievance was rejected at the
> institutional level in accordance with policy; therefore, this
> grievance is denied.

108. On October 22, 2019, I received the Appeal Response.

109. Burse's statement does not even state what the multiple issues/incidents are.

### 5. These above) provisions combined work multiple procedural traps.

110. The GDC grievance procedure forces him to either sacrifice some issues to exhaust

others, or serves as a trap to reject all issues. And both of these results are part of the custom and

culture of the dead-end grievance procedure. *See* §A, *supra*.

**C. The GDC Grievance Procedure is not an available administrative remedy because prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.**

**1. GDC officials thwart inmates from taking advantage of a grievance process through machination.**

**a. Denial of kiosk access to file grievances.**

111. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.A.2.a provides that "Grievances must be initiated on the J-Pay Kiosk (Kiosk) at those facilities with the Kiosk or the JPay Tablet (Tablet). All grievances shall be entered into the Kiosk. If the Offender does not have access to the Kiosk, the designated staff will initiate the grievance process in the JPay System link on Captiva."

112. At VSP, Although there are kiosks and tablets at VSP, there is no way to submit a grievance through the kiosks or tablets at VSP.

113. If there is a way to submit a submit a grievance through the kiosks or tablets at VSP, then I don't know about it and have never seen it because we are frequently denied access to a working kiosk.

114. Since I have been at VSP from December 26, 2018, to date, Dorm J-1 has never had a working kiosk.

115. Since I have been at VSP from December 26, 2018, to date, Dorm K-1 has never had a working kiosk.

116. Since I have been at VSP from December 26, 2018, to date, Dorm K-2 had a kiosk that was missing the camera, telephone headset, and frequently the USB cable needed to synchronize tablets to the kiosk, but the kiosk otherwise worked.

117. From January to July 2019, I had access to the Dorm K-2 kiosk. During that time, there never was a grievance procedure available through the kiosk.

118. In July 2019, Unit Manager Clyde Allen issued a directive that guards are to no longer allow any prisoners to use the Dorm K-2 kiosk until JPay repairs it. However, JPay never repaired it. As a result, since July 2019 to date, I have not had access to a kiosk at all.

119. In October 2019, I was moved from Dorm K-2 to Dorm J-1. Since then, I have not had access to a working kiosk.

120. From my arrival at VSP on December 26, 2018 date, JPay has still not repaired the Dorm K-2 Kiosk.

121. From my arrival at VSP on December 26, 2018 date, JPay has still not repaired the Dorm K-1 Kiosk.

122. From my arrival at VSP on December 26, 2018 date, JPay has still not repaired the Dorm J-1 Kiosk.

123. GDC officials make no attempt to contact JPay to arrange for them to repair the kiosks.

124. On _____, the VSP JPay Point of Contact, Operations Analyst Jimmy Knowles, told me that Dorm J-1 was "next" to have its kiosk repaired. To date, it has still not been repaired.

### b. Denial of Access to Grievance Forms.

125. Although GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.A.2 provides that "No Offender may be denied access to this procedure," prisoners are often denied access to grievance forms themselves.

126. Guards and counselors commonly deny prisoners by simply staying,. "I ran out," or "I don't have any," whenever a prisoner requests a grievance form. When prisoners ask a counselor for a grievance form, Counselors commonly respond, "I don't have any. They should

have some in the control booth. Ask the dorm officer." When prisoners ask a dorm officer for a grievance form, dorm officers commonly respond, "We ran out. Ask your counselor."

127. As a result of the above, *experienced* prisoners learn quickly that, when grievance forms are available, one should stockpile as many as possible so that one has them available when counselors and dorm officers say that they are not available.

128. *Inexperienced* prisoners can often be heard asking others for grievances forms when counselors and dorm officers say that they are not available.

### c. Colored Grievance Forms.

129. Unlike most GDC forms, grievance forms are always printed on colored paper. At GDCP, they are printed on green, blue, or pink paper. At GSP, they are printed on green paper. At MSP, they are printed on orange paper. At VSP, they are printed on purple paper.

130. In theory, the colored paper is supposed to flag the attention of Counselors and grievance coordinators to the grievances for processing.

131. In practice, the colored paper has three (3) adverse effects:

### i. Counselors avoid cells with grievances in their doors.

132. Counselors often tell prisoners, "if you have any forms to turn in, stick them in your door. When I come by and see it, I'll take it and turn it in." This often is true for some forms (e.g., visitation forms, phone list forms, counselor request forms, Tier Appeal forms, etc…) that are printed on white paper. However, it is not true as to grievances printed on colored paper. When counselors see colored paper sticking in a prisoner's cell door, they know that it is a grievance; thus, they will not go to that cell and will skip that cell.

### ii. Guards easily find—and destroy—colored grievances during shakedowns.

133. When guards are shaking down cells in general and paperwork in particular, colored paper stands out more than white paper. Guards know that colored paper is often a grievance. Thus, when guards see colored grievance forms during shakedowns, they will often damage or destroy said forms (*i.e.,* by ripping, crumpling, pouring water on, dropping in the toilet, etc...).

134. In addition to the grievances described herein, I have repeatedly had my grievance paperwork damaged or destroyed during shakedowns.

### iii. Counselors refuse to accept grievances on different colored paper.

135. When I first transferred to from GDCP to GSP, my counselor was Muriel Jackson, who never once provided me a grievance form. He always refused to do so, saying that I had to get the forms from dorm officers. However, dorm officers would always say that they didn't have any or that they ran out. As a result, I did not have any GSP green grievance forms. When I then attempted to turn in grievances on pink or blue colored forms that I brought with me from GDCP, Mr. Jackson often refused to accept them from me because they were on the "wrong-colored form."

136. When I first transferred to from MSP to VSP, my counselor was Mr. Richardson, who refused to provided me a grievance form. He refused to do so, saying that I had to get the forms from dorm officers. However, dorm officers would always say that they didn't have any or that they ran out. As a result, I did not have any VSP purple grievance forms. When I then attempted to turn in grievances on orange colored forms that I brought with me from MSP, Mr. Richardson often refused to accept them from me because they were on the "wrong-colored form."

### d. Counselors not making rounds so as to deny prisoners timely opportunities to turn in grievance forms.

137. GDC SOP 209.08 (IIB09-0003) "Administrative Segregation - Tier II,"[6] § IV.O

provides:

> Staff Inspection Visits:
> 1. The unit must be inspected on a regular basis. These
> inspections enable responsible officials to observe and evaluate
> conditions of confinement and speak with offenders.
> 2. These inspection visits must be conducted at least as
> often as listed in the following schedule:
> …
> > d. The General Population Counselor/Mental Health
> > Counselor shall conduct visits at a minimum of once per
> > week.

138. Despite this provision, Counselors often do not make rounds weekly, but sometimes
make rounds every two, three, or four weeks. The result is that, by the time the prisoner sees a
counselor—to whom he must submit a grievance—the ten(10)-day deadline will have expired.

### e. Counselors making rounds when prisoners were not in their cells.

139. Another tactic counselors use to avoid issuing grievance forms or accepting
grievances from prisoners is to make rounds when prisoners are not in their cells. For example, if
guards are running yard call or showers, counselors will often choose those times to make
rounds. If the prisoner is not in his cell—either because he is at yard or in the shower—he is
unable to obtain any grievance forms from the counselor or to turn in grievances.

140. I have repeatedly complained about this custom to many counselors. They say, "if
you have a grievance, stick it in your door. When I come by and see it, I'll take it and turn it in."
But they never do so because they can see the colored grievance form in the door. *See* §
**III.C.1.c.i,** *supra.*

### f. Counselors not speaking with prisoners when making rounds so as to deny prisoners timely opportunities to turn in grievance forms.

---

[6] https://www.powerdms.com/public/GADOC/documents/105951

141. Although this provision of SOP provides that "These inspections enable responsible officials to... speak with offenders," some counselors make rounds just to sign door charts, without ever speaking with the prisoner in the cell, or letting the prisoner know that they are even present. Counselors avoid speaking with offenders in order to avoid providing prisoners an opportunity to ask for grievance forms or to turn in grievances. The result is that, by the time the prisoner sees a counselor—to whom he must submit a grievance—the ten(10)-day deadline will have expired.

142. For example, Counselor Jeffrey Sikes at GSP and Counselor Richardson at VSP had a practice of sneaking in the dorms quietly without announcing their presence, signing door charts quietly, and sneaking out quietly, without the prisoners ever knowing that the Counselor was present or made his rounds. Both counselors also made a habit of sneaking in the dorms before inspection ready times, 8:00am-4:30pm, at times when they know many prisoners are still asleep.

143. I have repeatedly complained about this custom to many counselors. They say, "if you have a grievance, stick it in your door. When I come by and see it, I'll take it and turn it in." But they never do so because they can see the colored grievance form in the door. *See* § **III.C.1.c.i,** *supra.*

### g. Counselors refusing to even accept grievances from prisoners if the Counselor thought that the prisoner had two(2) active grievance.

144. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.C.1. provides:

> d. If the Offender submits a paper Grievance, the Offender must sign and hand-deliver the Grievance Form to any Counselor. *Immediately upon receipt of the grievance, the Counselor must give the Offender the receipt from the bottom of the Grievance*

> *Form and give the Grievance to the Grievance Coordinator.*
> Grievances submitted through the mail (in-house
> or U.S. Postal Services) will not be processed except for Good
> Cause.
> e. The Grievance Coordinator will screen the grievance. During
> screening, the Grievance Coordinator may:
> 1) Accept the grievance for processing;
> 2) Recommend that the Warden/Superintendent reject the
> grievance
> pursuant to one (1) of the categories listed in subsection
> IV.C.1.e.ii, below; or
> 3) *If there are two (2) Active Grievances, advise the Offender per*
> *the process outlined in IV.B.4.*

145. Pursuant to this SOP provision, counselors may not refuse to accept grievances from

prisoners—even if the prisoner has two(2) active grievances—but should accept the grievance

from the prisoner, issue the prisoner a receipt, and turn in the grievance to the grievance

coordinator for screening. Only after the grievance coordinator has screened the grievance and

determined that the prisoner as exceeded the two(2) grievance limit should the grievance

coordinator "advise the Offender per the process outlined in IV.B.4.

146. Despite this SOP provision, there is a widespread GDC custom wherein, counselors

will refuse to accept grievances from prisoners if *they think* that the prisoner has two(2) active

grievances.

147. I have repeatedly—easily more than 100 times—had many counselors refuse to even

accept grievances from me when they thought that I already had two(2) active grievances,

including but not limited to: Lesley Medlock, Torika Nash, and Johannes Goody at GDCP;

Muriel Jackson, Fred Leon Wilson, Counselor [First Name Unknown ("FNU")] Parrish, Jeffrey

Sikes, Randall Kirkland, Counselor [FNU] Houser, Heather Herndon, Andre Bateman,

Counselor [FNU] Evans, Multi-Function Correctional Officer ("MFCO") Harold Flowers, and

MFCO Mikasa Williams/Summersett at GSP; Curtis Jeffries and Alonzo Patterson at MSP; and Counselor [FNU] Richardson, Henderica Robinson at VSP.

148. This widespread custom causes two(2) problems:

### i. Counselors are sometimes wrong when they think a prisoner has two(2) active grievances when he does not.

149. First, on many occasions, the counselors erroneously thought that I had two(2) active grievances when, in fact, I did not because previously-filed grievances had already been answered (i.e., denied). When I would tell the Counselors of this fact, they would say something like, "Let me check with the grievance coordinator. If he/she tells me so, I'll accept it from you next time I see you." The result is often that, by the time the counselor actually accepted the grievance from me sees a counselor, the ten(10)-day deadline had expired.

### ii. Counselors are denying prisoners access to the exemptions from the two(2)-grievance limit.

150. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.C.1. provides:

> The following do not count toward the two (2) Active Grievance limit and will be processed:
> a. A grievance submitted by the Offender as an Emergency Grievance, and determined by the Duty Officer to be an Emergency Grievance;
> b. A grievance that involves allegations of physical abuse with significant injury to the Offender;
> c. A grievance that the Grievance Coordinator determines involves an important issue of prison security or administration, such as a serious threat to life, health, or safety; and
> d. A grievance that involves allegations of ADA violations: Offenders with communication disabilities will be provided effective communication for the grievance process pursuant to SOP 103.63 IV.E.

151. When a Counselor refuses to accept a grievance, he is preventing the grievance coordinator from making a determination whether the grievance falls into one of the above exemptions from the two(2-grievance limit, and is denying the prisoner access to these exemptions m

### h. Loss, or refusing to process, grievances turned in to counselors.

152. Not including grievances that are returned to prisoners unprocessed for exceeding the two(2)-grievance limit, grievances officials frequently throw away, intentionally lose, and refuse to process grievances.

153. I have repeatedly filed grievances that were neither processed, nor returned to me unprocessed for exceeding the two(2)-grievance limit, but which disappeared without any explanation and were never processed, including but not limited to: on to about November 1, 2012, November 28, 2012, May 6, 2013 (two(2) grievances), October 28, 2013, November 20, 2013, at GDCP; May 13, 2014 (two (2) grievances), September 2, 2014 (two(2) grievances), October 20, 2015, March 9, 2016 (two (2) grievances), October 20, 2016, April 20, 2017, June 1, 2017, December 22, 2017 at GSP; October 25, 2018, and December 3, 2018, at MSP; and January 15, 2019 at VSP.

### i. Denial of receipts for grievance forms.

154. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.C.1.d provides:

> d. If the Offender submits a paper Grievance, the Offender must sign and hand-deliver the Grievance Form to any Counselor. *Immediately upon receipt of the grievance, the Counselor must give the Offender the receipt from the bottom of the Grievance Form and give the Grievance to the Grievance Coordinator.* Grievances submitted through the mail (in-house or U.S. Postal Services) will not be processed except for Good Cause.

155. In 2013, Lisa Fountain issued a statewide Memorandum instructing counselors to not issue prisoners receipts at the time that a grievance is submitted. Instead, Fountain directed that, only after the grievance coordinator decided that the grievance would be processed, only then should they issue the prisoner a receipt, which was to be sent to the prisoner through the mail.

156. The effect of this Memo is that many prisoners, including myself, turned in grievances, never received a receipt for their grievances, never had their grievances processed, and never had any proof (receipt) that they actually submitted the grievance form in the first place.

### j. Unreasonably delaying grievances at the Institutional level.

157. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.C.1.f.v provides:

> The Warden/Superintendent has forty (40) Calendar Days from the date the Offender submitted the Grievance Form to deliver the decision to the Offender. A one-time, ten (10) Calendar Days-extension may be granted; however, the Offender must be advised, in writing or via the Kiosk/Tablet, of the extension prior to the expiration of the original forty (40) Calendar Days.

158. Under previous versions of this SOP, the Warden's deadline was thirty (30) days. GDC officials extended it to 40 days, then to 50 days, in order to delay administrative remedies so as to delay prisoners' ability to file suit.

159. Despite this provision, grievance officials often exceed both the forty(40)-day unextended deadline or the fifty(50)-day extended deadline.

160. Even when they do not exceed the deadline, often when the Warden has denied the grievance early in the 40-day period, either the Counselor or the Grievance Coordinator will

delay providing the Warden's response to the prisoner until late in the 40-day period so as to prevent the prisoner from filing another grievance.

161. One reason for this is to prevent the prisoner from filing another grievance once the present grievance is closed. The longer each grievance takes to close, the more the two(2)-grievance limit prevents the prisoner from filing any more grievances.

162. I have had some grievances take 4, 5, or 7 months before I received a response thereto. An example is Grievance #295740, which I filed on August 28, 2019, and for which I did not receive a response until March 13, 2020.

### k. Unreasonably delaying appeals at the Central Office level.

163. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.C.2.e provides:

> The Commissioner or his/her designee has 120 Calendar Days after submission of the Central Office Appeal Form to deliver a decision to the Offender.

164. Under previous versions of this SOP, the Appeal deadline was ninety (90) days. GDC officials extended it to 100 days, now to 120 days, in order to delay administrative remedies so as to delay prisoners' ability to file suit.

165. Despite this provision, grievance officials often exceeded both the previous 90-day deadline, previous 100-day deadline, and current 120-day deadline.

166. I have had many grievance appeals take many months *or years* before I received a response thereto.

### l. Not answering appeals at the Central Office level.

167. I have had many grievance appeals in which I never received any response to date, even years later, including, but not necessarily limited to: #146742 appealed on 04/15/2013,

29

#175847 appealed on 09/17/2014, #175848 appealed on 10/02/2014, #187072 appealed on

02/25/2015, #187074 appealed on 02/25/2015, #195044 appealed on 07/28/2015, #211088

appealed on 03/29/2016, #230881 appealed on 12/06/2016, #232741 appealed on 01/17/2017,

#236592 appealed on 03/02/2017, #246129 appealed on 08/31/2017, #262801 appealed on

05/17/2018, #269030 appealed on 08/21/2018.

### m. Denial of access to emergency grievances.

168. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," §§ IV.B.5.a and

IV.D purports to provide an emergency grievance that should not count toward the two(2)-

grievance limit, grievance officials never deem a grievance as an emergency grievance.

169. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," §§ IV.B.5.

provides:

> The following do not count toward the two (2) Active Grievance
> limit and will be processed:
> b. A grievance that involves allegations of physical abuse with
> significant injury to the Offender;
> c. A grievance that the Grievance Coordinator determines involves
> an important issue of prison security or administration, such as a
> serious threat to life, health, or safety; and

170. Despite this provision, grievance coordinators never treat a grievance as an

emergency grievance.

171. I have repeatedly filed grievances requesting that they be processed as an emergency

grievance because they concerned a threat to my health or Safety. Never once, under any

circumstances at all has any grievance coordinator at any facility processed any such grievance

as an emergency grievance.

### 2. GDC officials thwart inmates from taking advantage of a grievance process through misrepresentation.

### a. Deceiving prisoners into attempts at informal resolution to cause them to miss the ten(10)-day deadline.

172. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.A.4 provides that "Informal Dispute Resolution: The Department encourages Offenders to try to resolve complaints on an informal basis before filing a grievance. However, an Offender is not required to attempt an informal resolution before filing a grievance."

173. When prisoners do request to file grievances, counselors will often try to talk them out of it and encourage them to attempt informal resolution instead. This is a ruse to delay the prisoner from filing the grievance until after the ten(10)-day deadline to file a grievance has expired. Once that deadline expires, if the attempt at informal resolution proves unsuccessful, which it usually does, and the prisoner then files a grievance, the grievance will then be rejected as out of time.

### b. Falsely telling prisoners that matters are non-grievable.

174. When prisoners do attempt to file grievances, counselors will often try to tell them that the matter is non-grievable, and refuse to accept the grievance form from the prisoner. This is a ruse to protect GDC officials from suit.

175. Often, only prisoners who are experienced or knowledgeable of the grievance procedure will know better and insist that the Counselor file the grievance anyway.

### 3. GDC officials thwart inmates from taking advantage of a grievance process through intimidation.

176. GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.A.4 provides that "Informal Dispute Although GDC SOP 227.02 (IIB05-0001) "Statewide Grievance Procedure," § IV.A.3 provides that "Retaliation against an Offender for filing a grievance is

strictly prohibited. The prohibited retaliation includes, but is not limited to, disciplinary action against the Offender for filing a grievance."

177. Despite this provision of SOP, there is instead a widespread custom and culture of retaliation in GDC against prisoners for filing Grievances.

178. I have personally had many guards and other employees threaten me with retaliation or make other statements of retaliatory animus.

### a. Retaliation Disciplinary Reports.

179. One common form of retaliation is that guards will often write prisoners false disciplinary reports.

180. Because the disciplinary procedure is—like the grievance procedure—a sham, dead-end procedure, such false Disciplinary Reports will often come down to the guard's word versus the prisoner's, and the Disciplinary Hearing Officers always believe a guard's word over a prisoner's.

### b. Retaliation shakedowns and loss or destruction of property.

181. Another common form of retaliation is that guards will often shake down prisoners' cells unnecessarily and harassingly.

182. Another common form of retaliation is that guards will often trash, damage, destroy, or steal (under the guise of confiscation) prisoners' property when shaking down or inventorying it. I have experienced both many times throughout his incarceration, too many to count.

183. On many occasions, I have had legal documents destroyed during shakedowns. It is not uncommon for guards to "drop" legal documents in the toilet, throw legal documents on the floor and spill water or other liquids (e.g., cleaning chemicals, bleach, disinfectant, etc...) on them, or to trample on them, tearing or destroying them or damaging them beyond salvation. I

have experienced these many times, including but not limited to, on or about August 18-20,

2014; October 1, 2014; March 9, 2015; March 20, 2015, March 10-21, 2016; July 6, 2017;

September 10, 2017; November 29, 2017; January 17, 2018; January 24, 2018; February 8, 2018;

March 23, 2018; April 18-19, 2018; June 13, 2018; June 26, 2018; December 5, 2018; December

20-26, 2018; July 10, 2019; and August 21, 2019.

### i. Example #1

184. On April 10, 2018, I had surgery on my writing hand, it was wrapped in a
cast/splint, and medical personnel told me to avoid using it until I saw the orthopedic surgeon
again.

185. On April 19, 2018, I was transferred from Georgia State Prison ("GSP") to Macon
SP. Prior to his transfer, his property and cell were shaken down, and lots of his property,
including legal documents, were discarded and destroyed.

186. On or about May 26, 2018, I again saw the orthopedic surgeon, he removed my
cast/splint, and told me I could use my hand again.

187. On May 23, 2018, I filed Grievance #266941 regarding destruction or theft of my
personal property. On May 25, 2018, Warden Marty Allen denied my Grievance as allegedly
out-of-time, and I received the denial on June 14, 2018. On June 20, 2018, I appealed Grievance
#266643. On September 4, 2018, William Burse denied my Appeal as allegedly out-of-time, and
I received the denial on September 6, 2018.

188. On May 31, 2018, I filed a second Grievance #267458 regarding destruction or theft
of my personal property. On June 5, 2018, Warden Marty Allen denied my Grievance as
allegedly out-of-time, and I received the denial on June 14, 2018. On June 20, 2018, I appealed

Grievance #267458. On September 4, 2018, William Burse denied my Appeal as allegedly out-of-time, and I received the denial on September 6, 2018.

189. Apparently, neither surgery nor medical disability constitute good cause under the grievance procedure.

### ii. Example #2

190. On December 20, 2018, I was transferred from Macon SP to Baldwin SP ("BSP") as a sleeper, without any of my property or legal materials, which were left in my cell at MSP.

191. On December 26, 2018, GDC Officials loaded my property from my cell at MSP onto a van, drove to BSP to pick me up, and then drove me and my property to Valdosta SP ("VSP"). When I boarded the van at BSP, I saw that whoever loaded my property onto the van at MSP did not load or secure it properly, causing my boxes to fall over and spill their contents all over the van floor. Because I was restrained, I was unable to clean up the mess himself.

192. On December 26, 2018, upon arriving at VSP, I was first removed from the van and was not present to witness the unloading of my property from the van.

193. On December 27, 2018, most, but not all, of My property was returned to me. However, many of my legal documents were missing. I do not know if they were left behind at BSP, left behind on the van, or lost at Valdosta SP.

194. On or about December 28, 2018, I asked Counselor Richardson for Grievance Forms, he refused, telling me he didn't have any, and that I had to get them from the dorm officers. However, I repeatedly asked the dorm officers, and they repeatedly said that they ran out. *See* § **C.1.b,** *supra*. On or about January 3, 2019, I attempted to submit a grievance on an orange grievance form I brought with me from MSP, but Counselor Richardson refused to accept it, telling me I had to complete it on a purple VSP grievance form. *See* § **C.1.c.iii,** *supra*. When I

again asked Counselor Richardson for Grievance Forms, he again refused, telling me he didn't

have any, and that I had to get them from the dorm officers. Again, I repeatedly asked the dorm

officers, and they repeatedly said that they ran out. *See* § **C.1.b,** *supra*. On or about January 8,

2019, I again attempted to submit a grievance on an orange grievance form I brought with me

from MSP, but Counselor Richardson again refused to accept it, telling me I had to complete it

on a purple VSP grievance form. *See* § **C.1.c.iii,** *supra*. When I again asked Counselor

Richardson for Grievance Forms, he again refused, telling me he didn't have any, and that I had

to get them from the dorm officers. Again, I repeatedly asked the dorm officers, and they

repeatedly said that they ran out.. *See* § **C.1.b,** *supra*. After I finally obtained VSP purple forms

from another prisoner who has some, on January 15, 2020, I submitted a grievance to Counselor

Richardson. However, it was never processed, and to date, I never received any response. *See* §

**C.1.h,** *supra*.

### iii. Example #3

195. Since I transferred to VSP on December 26, 2018, to date, I have been on both

CERT/Supervisors-escort status and camera-escort status. This means that, anytime I leave my

cell, I must be accompanied by a CERT guard or supervisor (sergeant or above), and I must be

video recorded.

196. On August 21, 2019, Deputy Warden Ralph Shropshire, Sgt. Billy Sanchez, CERT

Aubrey Williams, and CERT [FNU] Foster shook down my cell, K-2-18.

197. When they removed me from my cell, at that time, I explained that I puddles of

water on my cell floor because water was leaking through the walls from the pipe chase. At that

time, none of my legal materials were on the floor.

35

198. After the shakedown, when they returned me to my cell, I immediately observed that most of my legal materials were on the floor, many of which were in the same puddles of water which I told them about when they removed me from my cell. Again, Deputy Warden Shropshire was filming using his cellphone camera, and I pointed this out on camera. They apologized and said it was "an accident."

199. On August 28, 2019, I filed Grievance #295740 on this incident, naming Deputy Warden Ralph Shropshire, Sgt. Billy Sanchez, CERT Aubrey Williams, and CERT [FNU] Foster. On March 6, 2020, Warden Shawn Emmons denied my grievance, and I received the response on March 13, 2020, seven(7) months later.

200. The Warden's Response states that, "DWS Shropshire states that when security entered your cell there was already property on the floor." (This was false and would have been disproven by Shropshire's cellphone video).

201. The Warden's Response also states that, "He [Shropshire] was not aware of staff putting property in water." (This was also false because I pointed out at the time, they apologized and said it was "an accident," and Shropshire's statement have been disproven by Shropshire's cellphone video).

202. The Warden's Response also states that, "Cert Ford states he does not recall seeing any property in water." This statement was technically true because CERT Ford was neither present in the dorm on the incident in question and was not even named in my grievance. Thus, one must wonder why the Grievance Investigator chose to interview Ford –who was not present—and not Sanchez, Williams, and Foster—who was present. This is an example of another GDC Grievance sham, dead-end, rubberstamp-denial investigation.

203. The sham, dead-end, rubberstamp-denial nature of GDC's grievance is shown by the fact that the grievance Investigator: (1) did not review or preserve Shropshire's cellphone videos, (2) did not review or preserve dorm surveillance videos, (3) did not interview me, (4) did not interview Sanchez, (5) did not interview Williams, (6) did not interview Foster, (7) did interview Ford, who was not even present, (8) rubberstamp-accepted Shropshire's false statement despite the ready availability of evidence that could have proven the falsity of his statements, and (9) delayed the grievance for seven(7) months.

204. Prior to August 21, 2019, I kept exhaustive notes on every use of force which I witnessed, and every use of MK-9 which I witnessed or experienced (i.e., felt), at VSP from December 26, 2018 to date, easily more than 100 times in that eight(8)-month period. Those notes were among the many documents destroyed in my cell shakedown on August 21, 2019.

### c. Retaliation Tier II placement.

205. Prior to Gumm v. Jacobs, No. 5:15-CV-00041-MTT-CHW (M.D.Ga. May 7, 2019) (Docs. 256-1 therein at 11, § III, ¶¶ 47), GDC SOP's provided that a prisoner can be placed on Tier I, Tier II, or GDCP/SMU/Tier III whenever "The offender is noted as a threat to the safe and secure operation of the facility." SOP IIB09-0002, "Segregation – Tier I," (effective August 1, 2013) § I.A.; SOP IIB09-0003, "Administrative Segregation – Tier II," (effective August 1, 2013) § VI.B.1.; SOP IIB09-0004, "Special Management Unit – Tier III," (effective August 1, 2013) § VI.B.1.

206. This criterion is so vague and broad that it can be applied virtually *at any time* and in any circumstance that could arise in a prison setting.

207. In practice, if prison officials like a prisoner, they place him on Tier I or in General Population. If they do not, they place him on Tier II or GDCP/SMU/Tier III.

208. As a result, prisoners who file grievances or lawsuits against GDC officials are frequently placed on Tier II/III stating that "The offender is noted as a threat to the safe and secure operation of the facility," as a pretext for retaliation for filing grievances or lawsuits, whereas similar situated prisoners who do not grievances or lawsuits against GDC officials are frequently placed on Tier I stating that "The offender is noted as a threat to the safe and secure operation of the facility," and/or returned to General Population.

209. On May 7, 2019, the Middle District of Georgia entered a Final Order And Permanent Injunction ordering that "The criteria for assignment to the SMU or Tier III Program shall be modified to eliminate the provision that allows any inmate to be assigned to the SMU if he is deemed 'a threat to the safe and secure operation of the facility.'" Gumm v. Jacobs, No. 5:15-CV-00041-MTT-CHW (M.D.Ga. May 7, 2019) (Docs. 256-1 therein at 11, § III, ¶¶ 47).

210. Pursuant to Gumm, GDC SOP 209.09 (IIB09-0004), "Special Management Unit - Tier III Program," was amended effective 09/06/2019, to eliminate the provision that allows any inmate to be assigned to GDCP/SMU/Tier III if he is deemed "a threat to the safe and secure operation of the facility."

211. Despite Gumm, GDC SOP 209.08 (IIB09-0003) still allows any inmate to be assigned to Tier I or Tier II if he is deemed "a threat to the safe and secure operation of the facility."

212. Even after Gumm, prisoners who file grievances or lawsuits against GDC officials are frequently placed on Tier II stating that "The offender is noted as a threat to the safe and secure operation of the facility," as a pretext for retaliation for filing grievances or lawsuits, whereas similar situated prisoners who do not grievances or lawsuits against GDC officials are

frequently placed on Tier I stating that "The offender is noted as a threat to the safe and secure operation of the facility," and/or returned to General Population.

### d. Other forms of Retaliation.

213. When a prisoner is on Tier II, a common form of retaliation is that guards will often write prisoners false negative remarks on a prisoner's door chart "Performance sheet," which will the be used as a reason to make that offender repeat that Phase over, adding another ninety (90) days to their duration on Tier II.

214. When a prisoner is on Tier II, a common form of retaliation is that guards will often falsely that the prisoner was "not inspection ready" ("NIR"), as a pretext to deny the prisoner showers, yard call, or incentive meals.

215. Prisoners who file grievances or lawsuits who request assignment to certain details, transfers from (or to) certain prisons, or placement in transition centers, or other privileges, will often have their requests denied when other similarly situated prisoners who do not file grievances or lawsuits will have their requests granted.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the above and foregoing are true and correct to the best of my knowledge.

This 16 Day of March, 2020.

**WASEEM DAKER**



WASEEM JAKER
#901373
VIDALIA SP
P.O. BOX 5360
VIDALIA GA 31603

**P**
**UNITED STATES**
**POSTAL SERVICE.**

US POSTAGE PAID

$0.00

Origin: 31601
04/01/20
129009040T-14

PRIORITY MAIL 2-DAY ®

Retail

EXPECTED DELIVERY DAY: 04/03/20

1 Lb 11.00 Oz

1006

B005

SHIP
TO:
PO BOX 8286
SAVANNAH GA 31412-8286

USPS TRACKING®NUMBER

SCOTT L. POFF CLERK
US DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
P.O.BOX 8286
SAVANNAH, GA 31412